## Weinel v. Commonwealth.

June 11, 1946.

Rehearing denied October 4, 1946.

Sawyer A. Smith for appellant.

Eldon S. Dummit, Attorney General, Guy H. Herdman, Assistant Attorney General, and Ulie J. Howard, Commonwealth's Attorney, for appellee.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER —Reversing.

Appellant was convicted of the crime of rape, allegedly committed upon Mrs. Ann Hutchinson, in her apartment in Latonia on the morning of January 9, 1946. He was sentenced to confinement in the State Reformatory for a period of ten years. Two errors are assigned for reversal: (1) The Court erred in overruling appellant's motion for a directed verdict of acquittal; and (2) the Court erred in admitting a verbal confession allegedly made at police headquarters in the presence of seven or eight officers.

Mrs. Hutchinson lived in an apartment consisting of three rooms and a bath on the second floor of a building owned by Reverend and Mrs. F. W. May. A five-room apartment on the first floor was unoccupied on the above-mentioned date, but Mr. and Mrs. May were cleaning and painting it for future occupancy. The apartment

house is entered from the street through a door leading directly into a reception room. In close proximity to the entrance, and on the right as one enters, are the stairs leading to the second floor apartment. The door of entrance to the apartment is at the head of the stairs. The ground floor apartment is entered from the narrow reception room through French doors. At about 10:30 o'clock in the morning, appellant entered the apartment house. Mrs. May was painting in the front room of the downstairs apartment. Appellant briefly engaged her in conversation, and then went to the basement and talked with Mr. May; he then ascended the stairs to Mrs. Hutchinson's apartment. Mrs. Hutchinson testified that, when appellant entered her apartment he sat for a while in a chair near the door, then inspected the various rooms in the apartment. She then stated to him that he had better go, that Mr. and Mrs. May "would think funny." Both of them went to the first floor apartment, Mrs. Hutchinson talking to Mrs. May while appellant talked to Mr. May. Shortly thereafter Mrs. Hutchinson returned to her apartment, and in about ten minutes appellant ascended the stairs and re-entered the apartment. Mrs. Hutchinson's account of what then occurred is as follows:

"Q. Did you see him (appellant) again that morning? A. I went back upstairs; I think I went into the kitchen to get a drink of water, and came back to the bed and was hemming my curtains.

"Q. Sitting on the side of the bed? A. Yes, sir.

"Q. How long were you there before Weinel came back, if he came back? A. I wasn't there very long at all.

"Q. What do you mean by not very long, a minute, an hour or two hours? A. I wouldn't say over ten minutes, if it was that long.

"Q. Did he come back? A. He came back upstairs, and as he came to the door he said he came to tell me goodby, and he walked over to the crib and said something to the baby, then walked back to the door.

"Q. He walked back to the door; did he hesitate or stop? A. Yes, that is when I became frightened, when he stood in the doorway.

"Q. Then what, if anything, did he do? A. He came over to the bed and took the curtains out of my hands, shoved me back on the bed. You told me to be blunt about it, so I am. He separated my legs with his legs and then he committed the act?

"Q. Did his body enter into your body? A. Yes sir.

"Q. Then after that what, if anything, happened; did he leave or stay? A. He went to the kitchen hurriedly; I dashed to the bathroom and locked the door, and before I came out of the bathroom, I heard the front door slam.

"Q. When you came out of the bathroom, was he there or had he gone? A. He had already gone. I went down to see Mrs. May.

\* \* \* \* \* \*

"Q. Did you or not at that time tell either Mr. or Mrs. May as to what had happened to you upstairs? A. No, not downstairs I didn't tell them of this act the first time; I didn't tell Mr. May of this act at all; I asked her to come upstairs.

\* \* \* \* \* \*

"Q. Did she go with you? A. Yes, sir, she came up.

"Q. Did you at that time make a complaint to her as to what had happened to you upstairs? A. Yes, I did.

\* \* \* \* \* \*

"Q. Did you or not consent to what happened to you, what he did to you up there that morning? A. No, sir.

"Q. What, if anything, did you do or try to do to prevent it? A. I tried to push him, and I said I was going to make an outcry.

"Q. You did what? A. I told him I was going to holler.

"Q. What did he say? A. His statement was, 'You better not.'

"Q. What effect, if anything, did that have on you? A. I knew he could overpower me; he frightened me.

"Q. Did he? A. Yes, sir.

"Q. What do you say, what is your weight? A. One hundred and forty.

"Q. What does Mr. Weinel weigh; how tall is he? A. I don't know that.

"Q. You have stated that there was a door or doorway at the top of the steps into the room where you were? A. Yes, sir.

"Q. Was that door open or closed? A. Open.

"Q. Was it an open doorway, or the door just opened? A. The door was just open.

"Q. What clothing, if anything, did you have on at the time of this incident? A. A skirt, a smock, a slip and brassiere.

"Q. Did you have on a waist of any kind? A. My smock was my waist.

"Q. What, if anything, did he do to your clothing? A. He jerked them back on the bed.

"Q. And you say he parted your lower limbs? A. Yes, sir.

"Q. Did you or not voluntarily submit to his intercourse with you? A. I did not.

"Q. Was it or not with or against your will? A. It was against my will.

\* \* \* \* \* \*

"Q. Did he or not push you down? A. He did.

"Q. After he pushed you down, what, if anything, did he do? A. I told you that he pried my legs apart with his legs.

"Q. And where were his hands? A. His hands were under me right here. (Indicating waistline.)

"Q. On your body? A. On each side of me.

"Q. What, if anything, did you do at that point? A. I had this part of me ready to push, and I tried to push his shoulders away, and all I could push was on his shoulders.

"Q. Did either of you say anything? A. Yes, I told him I was going to scream, and his statement was 'You had better not.' "

On cross-examination, she made the following answers to the following questions:

"Q. I am asking you now where his hands were? A. Right here. (Indicating waistline.)

"Q. Right where? A. On the bed.

"Q. Where was his right hand? A. Mr. Smith, if you had been in my place, you wouldn't know beans about it.

"Q. I am asking you where his right hand was. A. Right here, on the bed.

"Q. Where was his left hand? A. On the bed on this side, supporting himself on the bed.

"Q. He didn't have hold of you with his hands? A. No, he was bearing on me.

"Q. He didn't use his hands to separate your legs, did he? A. No.

\* \* \* \* \* \*

"Q. Did you say you were going to scream, holler, or make an outcry; which one did you say? A. Holler.

"Q. You didn't holler, did you? A. No, because he threatened me.

\* \* \* \* \* \*

"Q. You didn't call Mrs. May, did you? A. No."

It was shown by uncontradicted evidence that a person talking in an ordinary tone of voice in Mrs. Hutchinson's bedroom could be heard by a person in the room which Mrs. May occupied while the alleged crime was being committed.

It is inconceivable that the crime of rape can be committed in the manner related by the prosecuting witness. She stated that appellant did not use his hands except to rest them on the bed; there was no outward sign, either on her body or clothing, to indicate force was used; and the only threat she testified to was that, when she told appellant she was going to "holler," he said, "You had better not." Even if this conversation took place, it must have been whispered to have escaped the ears of Mrs. May. The crime of rape cannot be committed in such gentle manner; and no woman, zealous of maintaining her chastity, with help so near, would fail

to sound an alarm in an endeavor to prevent a criminal assault upon her. We have upheld juries' verdicts convicting men of this offense in many doubtful cases; but in each of those cases, there was some evidence of probative value upon which the jury could have rested its decision; and the Court was mindful, as it now is, of the rule prevailing in this jurisdiction, that any evidence, though it be slight, but which constitutes more than a scintilla, tending to establish the guilt of the accused, is sufficient to take the case to the jury and to sustain its verdict; and this Court will not disturb the verdict of a properly instructed jury upon the ground of insufficient evidence, unless it be so palpably and flagrantly against the evidence as to shock the conscience or necessarily lead to the conclusion that it was the result of passion or prejudice, rather than deliberate consideration upon the part of the jury. Branham v. Commonwealth, 223 Ky. 233, 3 S. W. 2d 629; Fortney v. Commonwealth, 290 Ky. 659, 162 S. W. 2d 193. But where the prosecuting witness relates circumstances which, in the light of human experience, preclude the possibility, or even the probability, of the crime having been committed, we will not hesitate to reverse the judgment and set aside the conviction. Webb v. Commonwealth, 223 Ky. 424, 3 S. W. 2d 1080; Carter v. Commonwealth, 245 Ky. 257, 53 S. W. 2d 521; Muncey v. Commonwealth, 245 Ky. 664, 54 S. W. 2d 46; Sells v. Commonwealth, 271 Ky. 447, 112 S. W. 2d 692; and Hightower v. Commonwealth, 286 Ky. 561, 151 S. W. 2d 39.

No doubt the minds of the jurors were inflamed by the fact that a fifty eight year old man engaged in illicit intercourse with the nineteen year old niece of his wife; and the further facts that the prosecuting witness was the wife of a soldier and the mother of a four months old child. In no sense of the word can such conduct be condoned; but the punishment should be commensurate with the offense, a misdemeanor under our statutes. KRS 436.070. Violent action resulting from the inflamed minds of jurors must be guarded against as carefully as violence of the mob in the street. In the latter case, law enforcement officers may prevent the injustice; in the former, the power of prevention vests solely in the courts, unless, perchance, the Chief Executive should exercise the prerogative of his office.

It is unnecessary for us to determine the validity of the so-called confession, because it adds nothing to the impossible story told by the complaining witness. We are of the opinion the trial court erred in overruling appellant's motion for a peremptory instruction.

The judgment is reversed.

Judge Thomas dissenting.

I am so profoundly convinced that the opinion of the Court in this case is such a departure from the rule followed by this court on appeal from judgments of trial courts that I feel compelled to state my reasons therefor.

The reversal of the judgment of conviction seems to have been arrived at from two statements made by the prosecutrix, which are, (1) that while she was lying on the bed (whether because of her being pushed, or voluntarily assumed) defendant separated her limbs without the use of his hands, and (2) that she did not make an outcry or scream while defendant was preparing for the intercourse, nor while engaged in it.

In commenting on statement (1), the opinion says: "It is inconceivable that the crime of rape can be committed in the manner related by the prosecuting witness. She stated that appellant did not use his hands except to rest them on the bed; * * *." The reason given for such conclusion is contained in the last sentence of the excerpt supra saying: "She stated that appellant did not use his hands except to rest them on the bed; * * *." Finally in giving the reason for reversal of the judgment and directing a peremptory instruction of the acquittal if the evidence was substantially the same on another trial, if one should be had, the opinion said: "But where the prosecuting witness relates circumstances which, in the light of human experience, preclude the possibility, or even the probability, of the crime having been committed, we will not hesitate to reverse the judgment and set aside the conviction."

Clearly the conclusion reached by the majority opinion was based upon the fact as stated in the first excerpt supra that "appellant did not use his hands except to rest them on the bed."

I am no expert in such matters, but it furnishes no

mountain to be climbed for me to conclude that a man weighing 185 pounds, more than six feet tall, 58 years of age and in sound health so far as the record shows, would have much difficulty in performing the task under consideration to a 19 year old mother with a four month old baby. Neither do I conclude that the court could take judicial notice that such a task would be impossible, and to thereby paint the prosecutrix as a perjurer in making that statement. Had I the time I feel sure that I could unearth many convictions for a like offense, and brought to this Court for review, wherein we affirmed the judgment, when the prosecutrix testified to similar statements, especially where other testimony in the case points to defendant's guilt as it does in this one, and to which I will hereafter refer, but which is not inserted in the opinion. I will therefore at this point desist from further comment on statement (1).

Referring to statement (2) supra, the opinion says: "It was shown by uncontradicted evidence that a person talking in an ordinary tone of voice in Mrs. Hutchinson's bedroom could be heard by a person in the room which Mrs. May occupied while the alleged crime was being committed."

The unquoted testimony uncontradictedly shows that no one at the time was in the first floor apartment of the building, except Rev. May and his wife. The former was, at the precise time of the unlawful act, either in the basement or in the kitchen located on the first floor, whilst Mrs. May was in a room painting windows. She stated that the door from the vestibule to that room was closed and not that she could have heard a complaint from the prosecutrix emanating from her room in an *ordinary* tone of voice—but that, "I *believe* I could if she hollered *loud enough*," clearly refuting the idea that an outcry could have been heard if it had "been whispered" as the opinion states. The prosecutrix admitted that she made no outcry, though she did threaten to do so, but was prevented by defendant saying to her, "You had better not." She also testified, in substance, that when defendant so spoke his eyes and features depicted viciousness, and that she was "frightened and upset."

It is not difficult to conceive in the circumstances (consisting of the lingering of defendant in and about the building occupied by the prosecutrix, plus the dis-

750

parity in their physique and strength) that the latter would naturally conclude that "the better part of valor" would be to postpone giving the alarm until the manifested probable danger to her personal safety was removed by the defendant's departure. Moreover, it will be noted that the prosecutrix immediately went to the bathroom of her apartment and locked the door where she waited until she heard the front door of the downstairs floor slam, thereby indicating to her that her assailant had departed from the premises. She immediately went downstairs where she met Mrs. May and requested the latter to come to her room where she publicized what had occurred. Within a few minutes thereafter Mr. May appeared and he and his wife uncontradictedly stated that the prosecutrix was then weeping, nervous and shocked, so much so that she was immediately carried by them to the doctor at a hospital. The physician found evidence of copulation, but could not tell how recent it had occurred. From the hospital prosecutrix was taken to police headquarters where she signed an affidavit for the arrest and prosecution of defendant, and later appeared before the grand jury and procured the indictment against him.

Paraphrasing the statement hereinbefore inserted from the opinion, I unhesitatingly say that it is "inconceivable" that a woman would perjure herself in order to publicize defendant's assault upon her, which would inevitably be followed by suspicion and talk by gossipers with more or less consequential disgrace and humiliation to the perjurer. It is also "inconceivable" to me that a woman who had invited, by her overtures and advancements, one of the opposite sex to have intercourse with her, would immediately commence crying and take steps to incarcerate her assailant within the walls of the penitentiary, or to suffer other punishment that might be inflicted if he were found guilty. By her acts immediately following within three or four hours—she procured a warrant for defendant's arrest by which she sought to have him placed in a position where such future attacks by him to her, or to other women, would be prevented. However, if she had been the amorous creature that defendant attempted to picture in his testimony, it would then be exceedingly strange that she sought his removal from the vicinity while serving his sentence and to thereby "kill the goose that laid the golden egg"

which gave her such immeasurable satisfaction. Moreover, several policemen stated, and defendant never denied it (but which testimony is not quoted in the opinion) that defendant said to them that he pushed the prosecutrix over on the bed, that he opened his trousers and lifted her skirts, but that he made no entrance because of evacuating before doing so, yet on the witness stand he admitted complete performance of his purpose.

It should also be observed that on defendant's first trip to the apartment of prosecutrix he looked at her baby, which purpose he stated was the only one that induced him to enter the room of prosecutrix. Almost immediately after entering her room defendant asked her how long her husband was away at his work, receiving the answer that it was from 7 a. m. until 6 p. m. without returning for lunch. He thus assured himself of no interference from that source in accomplishing his purpose. His lingering excited suspicion in her mind, and she got up and went downstairs followed by defendant who went back into the kitchen and engaged in conversation with Rev. May. Prosecutrix, thinking that he had absented himself from the premises, went back to her room soon to be followed by the reappearance of defendant, his purpose in returning thereto, being, as he stated, to bid goodbye to her and to again see the baby, from which I am reminded of the quotation

"O what a tangled web we weave,
When first we practice to deceive!"

All testimony in behalf of defendant in an effort to besmirch the character of prosecutrix was denied by her, and her reputation for truth, veracity, morality and uprightness was proven by her pastor, his wife and by numerous other acquaintances of her who knew her from childhood. The only attack thereon was made by defendant's son and daughter. In solving the issue of guilt or innocence of defendant both the jury and the court no doubt, and very properly, gave but little weight to the defendant's account of the transaction, since the incentive to escape punishment and to retain his freedom was so great as to overcome the obligation of his oath as a witness. He was confronted with the possible stigma of being branded as a felon with a long term of at least ten years' confinement in the penitentiary—probably for a longer period than the minimum of ten years that the

jury gave him, and possibly death; whilst the prosecutrix had all to lose and nothing to gain by divulging the transaction, except the commendable determination to punish her assailant. No other member of the public had witnessed the transaction, apparently indicating her consent thereto or willing participation therein, so as to induce her to falsify the facts in order to escape lasting disgrace. The opinion therefore appears to be supported only by the two weak crutches contained in statements (1) and (2), supra.

Many other facts, more or less pointing to defendant's guilt, appear in the testimony, but I will not attempt to recite, or to comment upon them, in this dissenting opinion, concluding it with the remark that if the prosecutrix consented to and invited the intercourse, then, instead of crying and weeping after it was over, she would have, no doubt, uttered the refrain that "Happy Days are Here Again." But instead she cried. One wonders why she wept, if defendant's account of the transaction be true. In that event she had reached her goal, and realized her dream; then why cry? The jury and the court, who perhaps knew the witnesses and who saw them while testifying, penetrated the "tangled web" and correctly answered the question.

Believing that the opinion strikes a body blow to the enforcement of the criminal laws—including, of course, the one involved, which was created centuries ago for the protection of the women of the land—I most respectfully dissent, in which Judge Siler concurs.