**W. R. PATRICK, Jr., Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

Nov. 8, 1968.

Rehearing Denied Feb. 7, 1969.

J. D. Atkinson, Jr., Greenup, for appellant.

John B. Breckinridge, Atty. Gen., James H. Barr, Asst. Atty. Gen., for appellee.

PALMORE, Judge.

W. R. Patrick, Jr., appeals from a judgment sentencing him to ten years' imprisonment pursuant to a verdict finding him guilty of raping his 14-year old niece, Jean Ann Stamper. KRS 435.090.

According to Jean Ann, the offense took place some time during the month of February, 1967, at the home of her grandfather, W. R. Stamper, Sr., in the Argillite community of Greenup County. The grandfather was then 82 years of age, lived alone, was in poor health, and was suffering from the shingles. Because of his condition he was not left alone at night, and either Jean Ann or her older sister, Mary Sue, would spend the night in his home. The house consisted of four rooms. The old gentleman slept in the living room, in the front of the house. The room to the left of the living room was used for storage purposes. Immediately to the rear of the living room was a kitchen, and a bedroom furnished with two beds was located to the left of the kitchen. Jean Ann and Mary Sue slept in this bedroom when they stayed overnight, and it was there that Jean Ann says she was raped.

The appellant was living in northern Ohio and working a night shift at Detroit. He was usually off work on Saturday and Sunday and occasionally visited and remained overnight with his father, though he and his witnesses testified he did not go to Greenup County at any time during February of 1967. We quote Jean Ann's testimony as follows:

Q– "During February of last year and January, did your uncle, W. R. Patrick, Jr., come down and stay all night on any occasions with your grandfather when you were there?"

A– "Yes."

Q– "How many occasions was he down there?"

A– "He come in about twice that month —same month."

Q– "Do you remember the exact date, Jean?"

A– "No."

Q– "On one occasion, did your uncle bother you?"

A– "Yes."

Q– "Would you go ahead and tell this jury in your own words what occurred at that time?"

A– "Well, I was asleep and he come in and he woke me up and was trying to take off my clothes and then started to bother me."

Q– "Started what?"

A– "Started having intercourse with me."

Q– "Was that against your will?"

A– "Yes."

Q– "What did you do to keep him from doing that?"

A– "I tried to fight him off. I hit him once."

Q– "Did he make any threats toward you?"

A– "What do you mean?"

Q– "Did he threaten you in any way?"

A– "He said if I told Mom and Dad would send me away."

Q– "Do you know what time of the night that was?"

A– "Well no. It was right after—I went to bed and I went to sleep."

Q– "Where in the house were you when this happened?"

A– "In the bed."

Q– "Would you kind of describe where everyone slept that night to the jury?"

A– "There's two beds—There was two beds in the room and I slept in one and he slept in the other."

Q– "Where did your grandfather sleep that night?"

A– "He has a bed in the living room."

Q– "How far was the bedroom that you slept in from your grandfather's bedroom?"

A– "There is a room that separates them."

Q– "A room separates them. How is your grandfather's hearing?"

A– "He can't hear very well."

Q– "Did your uncle have intercourse with you that night more than once?"

A– "Yes."

Q– "When? Go ahead and tell about the other time."

A– "Along toward morning he came in and started bothering me again."

Q– "Did you agree or consent for him to do that?"

A– "No."

Q– "Did you do anything to stop him?"

A– "I didn't do nothing. I was scared."

Q– "Did he threaten you or say he would hurt you in any way?"

A– "No. He just said that that first time."

Q– "What did he say that first time?"

A– "He said that Mommie and Daddy would send me away."

Q– "Why did he say they would send you away?"

A– "If I told what he done."

Q– "During the month of February or March or January, was your uncle ever there at your grandfather's

Q– "home on any other occasions that you were there?"

A– "Yes."

Q– "When was that, Jean?"

A– "It was the first—before this happened."

Q– "On that occasion, where did your uncle sleep?"

A– "Well he slept in on the couch some and he slept in the bed some."

Q– "On this night that this occurred, would you tell the jury who all was there at the house?"

A– "Well, his son, Calvin Patrick, and Willie Patrick—Willie Bolten, and Papaw told them to take me home so they took me home."

Q– "That was on the other occasion that he was there. When he came in that time, your grandfather made them take you back home?"

A– "Yes."

Q– "But the night your uncle had intercourse with you, tell the jury who was there in the house that night."

A– "There was him and me and my grandfather."

Q– "After this occurred, did you tell your parents or anyone what had happened?"

A– "No."

Q– "When did you tell them what had happened, Jean?"

A– "Well, I went to the hospital and they told me there and then I told them. It was about—I was four months then."

Q– "They told you that you were pregnant?"

A– "Yes."

Q– "As a result of this, did you have a baby?"

A– "Yes."

Q– "When did you have it?"

A– "November 13th.

* * * (On cross-examination)

Q– "This was a very small room, though, wasn't it?"

A– "Yes."

Q– "Very small house as far as that goes?"

A– "Had four rooms."

Q– "Four rooms. There was a sofa, I believe, in the living room next to your grandfather's bed?"

A– "Yes."

Q– "Nobody slept on that sofa that night?"

A– "No."

Q– "And your uncle, he spent the whole night in this room. Is that what you are saying?"

A– "Yes."

Q– "What time did he go to bed? Do you know?"

A– "I don't know."

Q– "Did he go to bed before you went to sleep?"

A– "No. I had already been in bed asleep."

Q– "Did you remember when he came in to go to bed? Did you wake up?"

A– "No. I didn't wake up until he bothered me."

Q– "Did you know what he was doing to you?"

A– "Not exactly."

Q— "Had this ever happened to you before?"

A— "No."

Q— "With anyone else?"

A— "No."

Q— "Did this hurt you in any way?"

A— "Yes."

Q— "Did you bleed or anything?"

A— "Yes."

Q— "Was there any blood on the sheets or anything like that?"

A— "I don't remember."

Q— "Did you show anybody any results of this?"

A— "No."

Q— "You didn't tell anybody about it?"

A— "No."

Q— "You didn't call out, out loud to your grandfather, or anything like that?"

A— "No."

Q— "He didn't hear you?"

A— "I didn't holler."

Q— "You did holler?"

A— "No."

Q— "You didn't know exactly what was happening. Is that what you are saying?"

A— "I knew in a way."

The testimony of W. R. Patrick, Sr., was taken by deposition. He said that when the appellant stayed overnight with him he slept on a couch in the same room occupied by the witness (W. R. Patrick, Sr.), though he recalled that one time when the appellant had his son and another boy with him the appellant and his son slept on one of the beds in the back room and Jean Ann's sister, Mary Sue, slept on the other bed. As best he could remember, there had been times when both the appellant and Jean Ann spent the night in his house, but the appellant always occupied the couch next to him, and he did not think the appellant could have done what Jean Ann said he did without his (the witness's) knowing it.

The appellant was a married man 43 years of age with eight children. He had not theretofore been convicted of any felonious conduct. There was nothing in the record to suggest any background of ill feeling toward him by Jean Ann or her mother. Aside from testimony by one of his sons that he had once observed Jean Ann misbehaving with one of the neighborhood boys (which she denied), there was no evidence reflecting discredit on her character or veracity.

According to the instructions given, the appellant could have been found guilty of rape under KRS 435.090 or carnal knowledge (statutory rape) under KRS 435.100. The jury found him guilty under KRS 435.090. His first contention is that the evidence was insufficient to support a conviction under that section. Of the cases cited in his behalf on that point Weinel v. Commonwealth, 302 Ky. 742, 196 S.W.2d 375 (1946), comes closest to being analogous on the facts. It was there held that because of the prosecuting witness's description of the manner in which she was forced to submit, and her failure to make an outcry while knowing help was nearby, her story was not sufficiently credible to support a conviction. Two members of the court joined in a vigorous dissent.

The prosecuting witness in *Weinel* was a married woman 19 years of age with a small child. As in this instance, the defendant was her uncle. In *Weinel* the prosecuting witness reported the incident immediately after it happened, whereas in this case Jean Ann did not reveal it until her pregnancy was discovered four months

later. On the other hand, the witness in *Weinel* was a woman, and Jean Ann was a child. We could philosophize on the subject at length, but suffice it to say that we think the evidence was enough. It is never a happy spectacle to see a man sent to the penitentiary on the word of one witness, but that is a matter for the jury to ponder and resolve.

During the course of direct examination appellant's half-sister, Ruby Stamper, appearing as defense witness, made the following remark: "I'm willing to take a shot or serum or anything you want to give me * * * Just to show I'm telling the truth." An objection by the Commonwealth's Attorney was sustained and the court admonished the jury not to consider the statement. Later on, the witness Jewel Florence Ruge, appellant's mother, also on direct examination, volunteered a similar remark, "I will take any kind of test to prove I'm telling the truth," whereupon the following exchange took place:

Mr. Kibbey (Commonwealth's Attorney): "Your Honor, why do these witnesses want to take a test?"

Answer (by witness): "I want you to believe this. I believe when anybody tells anything, to back it up."

Mr. Kibbey: "I'm going to move they all take a test."

Mr. Atkinson (defense counsel): "We will accept that."

Mr. Kibbey: "We agreed to do it once before and they didn't."

Answer (by witness): "My son always come to see me—"

Judge Sowards: "You weren't being asked any question. Don't talk unless you are answering a question."

Mr. Atkinson: "You may ask."

■ Appellant's first and only objection to the remarks thus made by the Commonwealth's Attorney was presented in his motion for a new trial. Though RCr 9.22 eliminates the necessity for formal exceptions to adverse rulings, it is made clear by the provision that "it [shall be] sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court," etc., that timely objections are still required under the Rules of Criminal Procedure. A defendant cannot await the verdict of the jury before presenting an objection to improprieties that occurred during the trial; Cf. Senibaldi v. Commonwealth, Ky., 338 S.W.2d 915, 919 (1960).

■ The same principle applies to the deputy sheriff's testimony concerning an inculpatory remark allegedly made by appellant while he was being transported under arrest. Counsel's objection to the witness's first answer was sustained. Then the question was rephrased, so as not to be leading, and the witness was permitted to repeat the information without objection. Moreover, since the appellant was not being interrogated when he made the alleged remark the requirements of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were not applicable.

■ The last argument in support of a reversal is that the court erroneously refused to permit a character witness to testify for the appellant because she had remained in the courtroom during the trial, the other witnesses having been excluded by a rule for separation. We concede this was a tenuous basis on which to bar a character witness, but (1) the evidence would have been cumulative, and (2) there is no avowal to show what the witness would have said. Hence there can be no basis for holding the exclusion prejudicial.

The judgment is affirmed.

All concur.