**Ricky GIBBS, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

Nov. 7, 1986.

Discretionary Review Denied by Supreme Court March 3, 1987.

Timothy T. Riddell, Asst. Public Advocate, Frankfort, for appellant.

David L. Armstrong, Atty. Gen., Cicely Jaracz Lambert, Asst. Atty. Gen., Frankfort, for appellee.

Before CLAYTON, LESTER and MILLER, JJ.

CLAYTON, Judge.

Ricky Gibbs appeals from a final judgment of the Madison Circuit Court sentencing him to five years of imprisonment based upon his conviction for second-degree burglary and from a separate order of the same court denying his motion for new trial. On appeal, Gibbs argues that the trial court erred in 1) admitting into evidence his "mugshot," 2) excluding expert testimony on the unreliability of eyewitness identification, and 3) failing to grant his motion for new trial based upon newly discovered evidence.

On October 22, 1984, Joy Hagan returned to her apartment in Richmond, Kentucky, to find a young black male running out the front door. As he dashed past at a distance of approximately five feet, the startled Hagan was able to view his full face and profile. According to her testimony at trial, the man appeared to be a clean cut, muscular black male, approximately twenty years old with no facial hair. She also noticed at the time that he was wearing a tan coat beneath which he appeared to be hiding something. Thereafter, entering her apartment with her brother, Hagan discovered that $3,500 in jewelry was missing.

On October 25, 1984, Hagan was shown a photographic lineup of eight pictures out of which she identified Randall Williams as a black male standing outside her home the day of the burglary. On being shown a second lineup containing Ricky Gibbs' picture, Hagan identified the appellant as the man running from her apartment. A search warrant was obtained for his residence. While none of the missing jewelry was discovered upon execution of the war-

rant, the tan coat described by Hagan was found in an upstairs bedroom.

Approximately a week later, at a preliminary hearing, Hagan again identified Ricky Gibbs. Although Gibbs' brother, Nathan Gibbs, was also present, Hagan did not believe him to be the man she saw as he was too tall, his hair was too long and his cheek bones were different.

At trial, appellant testified that on the day of the burglary, he was with his girlfriend, Alicia Ballew, the entire day. According to Gibbs, the burglary was actually committed by his brother, Nathan Gibbs, who had been paroled from his second imprisonment for burglary three days before. Allegedly, Nathan admitted this to Ricky, showing him a diamond ring and gold necklace taken from the apartment. This version of events is corroborated by Ballew, who testified that Ricky was with her the entire day on October 22, 1984, and that Nathan had admitted to her that he committed the burglary, showing her some stolen rings and earrings. Ballew added that Nathan had also told her that if questioned, he would say that Clark Bates had committed the crime.

Nathan Gibbs then took the witness stand. After admitting his prior burglary convictions, Nathan testified that on the day in question, he caught a ride with Clark Bates. Bates showed Nathan some jewelry he had been given by a girl. Nathan was then given one of the rings which he later gave to the appellant. Ricky Gibbs denies ever having received this ring. Although Nathan admitted that the tan jacket found in the search was his, he denied ever having committed the burglary or telling anyone that he had done so.

Following instructions and closing arguments, the jury returned a verdict of guilty recommending five years of imprisonment. One month later, on March 4, 1985, appellant filed a motion for a new trial. As a basis for the motion, it was alleged that after the trial, the appellant's eldest brother, Wayne Gibbs, approached him, telling Ricky that at about the time of the burglary, Nathan gave him a ring set with a light blue stone and warned him not to tell anyone. The ring was produced and placed in the custody of Ricky's trial attorney. The ring was subsequently identified by Hagan as being one stolen from her home. No other items of Hagan's jewelry were produced at trial. Trial counsel maintained by supporting affidavit that his diligent pretrial investigation had failed to reveal this new evidence as Wayne Gibbs lived apart from Ricky and Nathan and was not fully aware of the nature of the charges pending against appellant prior to his trial. Along with the affidavits alleging these events, the avowal testimony of Dr. Reed and a report of a polygraphic examination were included at the hearing on the motion. Following a hearing, the motion was denied. Timely appeal was then taken to this Court.

I.

THE "MUG SHOT"

Prior to trial, Gibbs moved to suppress the use of his police photograph on the basis of both the police reference appearing on it and the distinctive combined frontal and profile views associated with police photographs. In response, the Commonwealth indicated that it did not intend to introduce the mug shots; but, if it did, the pictures would be cropped to delete the police reference. At trial, Gibbs' counsel, while cross-examining Joy Hagan about her identification of Randall Williams, attempted to introduce an unaltered mug shot of Williams. The Commonwealth objected indicating that all the photographs from the lineup would have to be introduced. Over the appellant's objection, all of the lineup photographs were introduced into evidence after the police references were deleted. No alteration was made, however, to the traditional front and profile view. As explanation for its decision to admit the photographs over appellant's objection, the trial court opined that appellant had opened the door by introducing the unaltered shot as the Commonwealth would not have otherwise attempted to introduce any of the photographs.

■ Gibbs now argues that introduction of the photograph denied him a fair trial. Under *Redd v. Commonwealth*, Ky.App., 591 S.W.2d 704 (1979), introduction of mug shots into evidence is permissible where the prosecution has a demonstrable need to introduce them, the photographs introduced do not imply that the defendant had a criminal record, and the manner in which they are introduced does not draw "particular attention to the source or implications of the photographs." *Id.* at 708 (citing *United States v. Harrington*, 490 F.2d 487 (2nd Cir.1973)). *See Roberts v. Commonwealth*, Ky., 350 S.W.2d 626 (1961). Looking to the manner and rationale for introducing the challenged photographs, we conclude that no error was occasioned by their introduction at trial.

■ Prior to the appellant's attempt to introduce the unaltered photograph of Williams, no effort was made by the Commonwealth to introduce any of the photographs. Obviously had the jury seen only Williams' photograph, without viewing those shown in both lineups, confusion would have resulted, as Williams' picture would not coincide with the jurors' courtroom view of Gibbs thus leading the jurors to conclude that Hagan had misidentified Gibbs.

Moreover, the photographs which were admitted had been partially altered to delete all police references nor was the appellant shown to be wearing a prison garb. While the better practice would have been to have further cropped the photographs to separate the juxtaposed full face and profile views, we cannot conclude that the prejudice resulting from their introduction outweighed the resulting probative value.

This is not a situation as in *Redd* where a prosecution witness testified that the photographs admitted were mug shots taken from past incidents or that the photographs had been assembled for investigation. *Redd, supra* at 708. Nor did the Commonwealth, as in *Roberts*, accompany the admission of the photographs with testimony of police officers as to appellant's bad reputation as a law abiding citizen. To the contrary, the introduction of the altered photographs was unaccompanied by any such suggestive commentary, was relevant to the critical question of Hagan's identification of the appellant and was necessitated by appellant's own attempt to introduce Williams' unaltered photograph.

## II.

### EXPERT TESTIMONY REGARDING EYE WITNESS IDENTIFICATION

In his second issue on appeal, Gibbs argues that he was denied a meaningful defense as a result of the trial court's refusal to admit expert testimony regarding the unreliability of eyewitness identification. Had the appellant's expert, Dr. Reed, been permitted to testify, appellant maintains that the jury would have been informed of such specific psychological factors as "weapons focus," post-observation suggestion, cross-racial identification and the potentially inverse relationship between reliability of identification and the certainty with which a witness testifies to that identification.

■ Two difficulties confront the appellant in making this argument. First, such expert testimony has long been excluded by Kentucky courts as invading the province of the jury in assessing the credibility of witnesses. *See Pankey v. Commonwealth*, Ky., 485 S.W.2d 513 (1972). *See also Evans v. Commonwealth*, Ky., 702 S.W.2d 424 (1986) (instruction on eyewitness identification not required). Second, the appellant has failed to preserve the issue for appellate review regardless of the merits of his argument. *See State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983); *People v. McDonald*, 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709 (1984); *United States v. Smith*, 736 F.2d 1103 (6th Cir.1984).

Prior to trial, appellant by counsel moved to suppress the eyewitness identification of Joy Hagan. Accompanying that motion was a companion motion entitled "Motion to Provide Funds for Expert Witness *For Suppression Hearing*" (our emphasis). By

that motion, appellant specifically requested monies for "Dr. Thomas E. Reed in preparation and testifying *at the suppression hearing ...*" (our emphasis). As set out in paragraph three of the motion, the rationale for paying the expert witness was that "[t]he defendant needs this particular testimony in order to *make his motion to suppress*" (our emphasis).

At the beginning of the hearing on appellant's motion, the trial court specifically asked if this expert witness testimony was to be heard in the present hearing, in effect the suppression hearing. Trial counsel for appellant responded "that is correct." Upon the trial judge's comment that such evidence would invade the province of both the judge and the jury, Gibbs' trial counsel responded that "Well, we're not going to be offering the evidence for the jury at all, it's solely for purposes of this hearing." The judge then concluded that the testimony could be taken by avowal outside his presence. On February 25, 1985, after the jury returned its verdict of guilty on February 4, 1985, Dr. Reed's avowal testimony was taken with trial counsel for Gibbs then stating for the record that it was to be taken both for the purpose of the suppression hearing and for presentation to the jury. Thus, only after Gibbs' conviction was the avowal testimony expressly offered to the trial judge for the additional purpose of presentation to the jury. Appellant's prior objection at the suppression hearing ran solely to the trial judge's refusal to consider the testimony at that hearing. No attempt was made to elicit Dr. Reed's testimony at trial.

Accordingly, appellant has failed both to raise and preserve the issue for appellate review. At no time before or during the course of the trial was the trial court afforded the opportunity to directly rule on the issue of the presentation of such evidence *to the jury*. In this context, the comment of the trial judge that such testimony would invade the province of the jury was merely an unelicited expression of legal opinion. The appellant simply did not attempt to use the evidence in such a manner until raising the issue in his motion for

new trial. At that time, it was far too late to do so. *Patrick v. Commonwealth*, Ky., 436 S.W.2d 69 (1968) (defendant cannot by motion for a new trial successfully object to improprieties occurring at trial); *Arnold v. Commonwealth*, Ky., 433 S.W.2d 355 (1968).

### III.

On March 4, 1985, Gibbs moved the trial court for a new trial on the basis of the newly discovered ring in Wayne Gibbs' possession. Along with the supporting affidavits of Ricky and Wayne Gibbs and their trial counsel, a polygraphic examination report of Ricky Gibbs was included indicating no deception in his negative response to the question, "Did you break into that house on Norwood Drive?" The Commonwealth later commented at the hearing on the motion on March 6, 1985, that such a report was inadmissible for any purpose whether at trial or other post-judgment proceedings. No objection or request for a ruling on the admissibility of the report was requested however. Both the report and Dr. Reed's avowal were admitted without objection.

On appeal, Gibbs forcefully argues that the newly discovered ring is the sole tangible evidence corroborating his version of events in what was otherwise an inconclusive swearing contest. In this regard, we are urged to examine the avowal testimony of Dr. Reed and the polygraphic report of Ricky Gibbs to evaluate the possible abuse of discretion of the trial court in denying appellant's motion.

■ We confine our review solely to the supporting affidavits and the videotaped transcript of the March 6, 1985 hearing. No Kentucky judicial decisions support the consideration of polygraphic examinations in post-judgment proceedings. The permitted use of such an examination made in *Gall v. Commonwealth*, Ky., 702 S.W.2d 37 (1985), contrary to appellant's argument on appeal, was not to support the credibility of the examination subject, but to show the diligence of his trial counsel's preparation in the face of accusations of ineffective

assistance made via an RCr 11.42 motion. The substantive results of that examination were simply irrelevant. In the instant appeal, however, Gibbs urges us to make use of the report for the truth of the statements contained therein. That, we cannot do. The same considerations which would exclude admission of such hearsay evidence at trial would act to prohibit its consideration at a post-judgment proceeding. In a similar vein, we would exclude consideration of Dr. Reed's avowal testimony, noting as before that until appellant's conviction, it was apparently intended only for consideration at the suppression hearing. As neither the avowal testimony nor the report would be admissible upon retrial, we shall give them no further consideration.

■ With respect to the standard for granting a new trial under CR 59.01(g), our courts have repeatedly held that newly discovered evidence must be of such a decisive nature that it would with reasonable certainty have changed the verdict if a new trial was granted. *Hollowell v. Commonwealth*, Ky., 492 S.W.2d 884, 886 (1973); *Dolan v. Commonwealth*, Ky., 468 S.W.2d 277, 283 (1971). In determining whether the evidence is of such a nature, it is equally well settled in the law that the trial court is to be vested with broad discretion. *Whelan v. Memory-Swift Homes, Inc.*, Ky., 315 S.W.2d 593 (1958). We find no abuse in the trial court's refusal to grant appellant's CR 59.01(g) motion.

The ring and Wayne Biggs' intended testimony are not only corroborative of appellant's version of events, but of his brother Nathan's as well. At trial, Nathan Gibbs testified that he had been given a ring from the jewelry in Clark Bates' possession. Nathan additionally testified that this ring was given to his brother. Therefore, the tangible evidence is ambiguous at best as it might easily be interpreted as supporting either brother's version of events. Under these circumstances, the newly discovered evidence cannot be said to have been so decisive as to warrant a new trial.

The judgment of the Madison Circuit Court and its order denying appellant's motion for new trial are affirmed.

MILLER, J., concurs.

LESTER, J., writes separate opinion.

LESTER, Judge.

This separate opinion should not be denominated as either a concurrence or a dissent for it is written to point out two areas of our criminal jurisprudence which should be specifically addressed by our Court of last resort.

I direct the reader's attention first to the contention surrounding the effort of appellant to introduce the expert evidence concerning the various psychological factors that may affect the reliability of eyewitness identification. I am fully aware of our rule enunciated in *Pankey v. Commonwealth*, Ky., 485 S.W.2d 513 (1972), to the effect that such testimony constituted an invasion of the province of the jury in assessing an eyewitness' credibility but I am also cognizant that "the vagaries of eyewitness identification are well known; the annals of criminal law are rife with instances of mistaken identification." *United States v. Wade*, 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967). Of great interest are the views and reasoning of the Supreme Court of California sitting En Banc in *People v. McDonald*, 208 Cal.Rptr. 236, 37 Cal.3d 351, 690 P.2d 709 (1984), wherein it was pointed out that such expert evidence should not be adduced to credit or discredit any particular witness but to inform the jury that there exist certain psychological factors that do in fact exist surrounding eyewitness identification such as the cross-racial element, presence or absence of a weapon, stress of the moment, unpleasantness of viewing a line-up, reliability of recall or memory and others. I see no reason why, in cases such as the one at bar, we should deny a jury the benefit of the extensive studies which would be of significant aid in making an accurate conclusion as to the reliability of the identification. We should take heed, in certain close cases, to the words of Judge

Bazelon speaking in *United States v. Brown*, 461 F.2d 134, 145 (D.C.Cir.1971), to the effect:

> One critical problem (of eyewitness identifications) concerns their reliability, yet courts regularly protest their lack of interest in the reliability of identifications, as opposed to the suggestivity that may have prompted them, arguing that reliability is simply a question of fact for the jury. (Citation omitted). There already exists, however, great doubts—if not firm evidence—about the adequacy and accuracy of the process. Unquestionably, identifications are often unreliable—perhaps consistently less reliable than lie detector tests, which we have in the past excluded for unreliability.

One other issue is worthy of comment. Appellant urges that we permit him to introduce the results of a polygraph test in the post-conviction process of seeking a new trial based upon newly discovered evidence. The concept of admitting the conclusions of a polygraph examination in matters arising after trial is not novel to this jurisdiction for it was employed in *Gall v. Commonwealth*, Ky., 702 S.W.2d 37, 44 (1986), but limited in purpose to vindicating trial counsel of his alleged ineffectiveness. That purpose has great merit but is it not equally important to permit an accused to attempt to prove his innocence of the crime charged—at least in post-judgment proceedings?

Counsel for appellant referred us to the logic of the Supreme Court of Michigan in *People v. Barbara*, 400 Mich. 352, 255 N.W.2d 171 (1977), which, after reaffirming its refusal to permit polygraph evidence at trial, said:

> However, the question of whether the polygraph may be used to assist the judge in determining whether to grant a motion for a new trial is another matter. Less formal evidentiary requirements are commonly found at the post-conviction motion, and matters such as affidavits which may not be admissible at trial may be used to assist the judge to determine whether the request for a new trial

has merit. Polygraph tests permitted in this context would be merely used to buttress the credibility of new witnesses, the evidentiary value of whose testimony satisfied traditionally strict criteria for ordering a new trial. Thus, the polygraph examination would not itself be evidence, either at the post-conviction motion or at the trial itself, should one be granted.

> On this basis, and within carefully drawn and defined limitations, we hold that a judge may use, in his discretion, polygraph tests and testimony offered by defendant only to help determine whether to grant a post-conviction motion for a new trial.

We commend the foregoing to our Supreme Court for their review.