Manford CARRIER, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

April 20, 1962.

Cabell D. Francis, Stanford, for appellant.

John B. Breckinridge, Atty. Gen., Robert L. Montague, III, Asst. Atty. Gen., for appellee.

MOREMEN, Judge.

Appellant, Manford Carrier, was indicted by a grand jury in the Casey Circuit Court for the offense of rape of Barbara Tinsley, a female above the age of twelve years and under the age of sixteen years, appellant being a male person above the age of twenty-one years. He was convicted of having carnal knowledge of Barbara Tinsley with her consent and his punishment was fixed at confinement in the penitentiary for a period of five years. On this appeal it is asserted that the verdict is flagrantly against the law and the evidence.

■ The prosecutrix, Barbara Tinsley, lived on a farm in Casey County near the Casey-Lincoln County line. She was fourteen years old on March 3, 1961. On the 11th day of that month she walked down the highway towards the post office at Middleburg. Appellant drove down the same road with his friend, Carlos McKee, stopped the car beside Barbara and asked her if she wanted to ride with them. They talked a while and discovered that they had a mutual acquaintance, Faye Elmore, and apparently an arrangement was made to invite Faye Elmore to join them. Then Barbara went to the post office to see Mrs. Luster whose husband was postmaster. She stayed with Mrs. Luster from about twelve o'clock until three in the afternoon when the post office was closed. It appears that Barbara's mother had been convicted of a felony and had been paroled to Mr. and Mrs. Luster and that Barbara's purpose in visiting the post office was to ask the Lusters to go to her mother's home. Mrs. Luster dropped Barbara off at the lane that led to her home. In the house Barbara found a note from her mother saying that she had gone to visit a neighbor. She re-

turned to Mrs. Luster and informed her of the whereabouts of her mother. While she was standing there appellant drove up and handed her a note from Faye inviting her to come down to the store. Barbara requested on the back of the note that Faye come up to see her. Appellant departed but soon returned with Faye. Barbara went to the neighbor's house and asked her mother if she could go with them. She was given permission to go with them for a short time. She returned to the car and they drove down to Napier's grocery store. There they picked up McKee who had been waiting for them. Then Faye evidently changed her mind and said she wasn't going. She got out along with two younger sisters who had been collected on the road. There is quite a difference in the stories given by the witnesses as to what happened then. Barbara stated that when she started to get out and had placed one foot on the ground, the McKee boy grabbed her and pulled her back into the car, that she resisted but was forced to remain in the car. Both men denied that this occurred and said she went voluntarily, but Faye corroborated her story.

They went down the road toward Middleburg and through Yosemite toward Argyle. Barbara stated that they went about a mile beyond an unidentified filling station, turned off on a dirt road and drove for about two-tenths of a mile. There, she said her clothes were removed (she was wearing slacks, blouse and a sweater) and she was raped against her will and under threats of physical harm. She stated they were there about ten minutes. McKee and appellant testified that they did not pull off the main road, but they did admit that they stopped and both got out of the car, stepped back into the woods where each drank a can of beer. It was light, about four-thirty or five in the afternoon and the usual number of cars passed while they were there.

After the stop, they went to Argyle and purchased gasoline and then drove back to Yosemite. Upon being asked if she knew any girls there, Barbara replied that she knew Rose Phillipi so they drove over to her house and called her out, but while Rose was talking to them her boy friend came by and that seems to have destroyed any chance of a date. Barbara then said she knew Juanita Salyers and they drove to her house where they learned that Juanita had a date for the evening so they soon left. They then returned to Napier's grocery in search of Faye and were informed that Barbara's mother and Faye had gone down the road in a car. Barbara told the men that she knew a girl who lived at Liberty by the name of Corman and they drove to Liberty in search of her. They pulled into the court house square and parked in front of Brown's Grill. The town policeman came over and asked if she was the Tinsley girl and when given an affirmative answer, the policeman arrested the two men.

Soon thereafter at about seven o'clock, at the request of the county judge, Barbara was examined by Dr. Garnett Sweeney. He found that she was not a virgin (Barbara had testified that she was not), that a smear taken from her vagina did not reveal any sperm, and he found no fresh bruises to her vagina or evidence of abuse and no bruises on her body.

Both appellant and Carlos McKee, the other passenger in the car, testified that Barbara joined them voluntarily and then engaged in the search for another girl; that no one touched the prosecutrix or made any threats to her or had intercourse with her and that the only place the car was ever stopped along the highway was when they pulled over, stepped into the woods and drank a can of beer during which time other cars were passing on the highway. The witnesses, Juanita Salyers and Rose Phillipi, the two girls who were visited immediately after the alleged rape, testified that Barbara made no complaint to them of any abuse and that she had asked them to go with her, Carrier and McKee. The city policeman of Liberty stated that he saw nothing unusual in Barbara's manner when he approached the automobile after they had come to Liberty.

We recognize the well established rule that it is the peculiar province of the jury to determine the credibility of witnesses and to assess the weight to be given to their testimony to the extent that in most cases the jury may believe one witness even though he is contradicted by others, or may believe one set of witnesses to the exclusion of another set. Kennedy v. Commonwealth, 194 Ky. 502, 239 S.W. 796. We have recognized some distinction, however, between the ordinary case and one such as is presented here. It is pointed out in Holland v. Commonwealth, Ky., 272 S.W.2d 458, that in cases of this nature the charge is so easily made and so difficult to disprove that when coupled with natural indignation so often created by the charge itself, jurors are often adversely affected and therefore great care is required in appellate review. When the conduct of prosecutrix as related by her and others is contrary to natural and common rules of behavior, her testimony is carefully scrutinized. In Carter v. Commonwealth, 245 Ky. 257, 53 S.W.2d 521, 522, it was said:

"While it may not be said that the prosecuting witness' recital as to how the alleged crime occurred is inherently impossible and totally at variance with natural laws, the evidence as to the attending circumstances and her subsequent conduct is such as to render it inherently improbable and to rob it of any probative value or fitness to carry conviction."

In Holland v. Commonwealth, Ky., 272 S.W.2d 458, 459, where the facts were not detailed in the opinion, the court made this observation:

"The circumstances recited by the girl and the corroborative evidence tend to support the appellant's contention that the case falls within the class of cases in which it is held that a verdict of guilt of rape will be deemed unsupported· by the proof where the evidence as to the necessary element of force or threatened violence to overcome resistance is so incredible or improbable or so at variance with natural laws or common human experience as to be patently untrue. This rests upon the appellate court's conclusion that the conviction was the result of passion and prejudice and was not based upon evidence having the quality of legal proof. Muncey v. Commonwealth, 245 Ky. 664, 54 S.W.2d 46; Carter v. Commonwealth, 245 Ky. 257, 53 S.W.2d 521; Weinel v. Commonwealth, 302 Ky. 742, 196 S.W.2d 375."

Since the time of Lord Hale, who admonished, "it must be remembered that this is an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, though never so innnocent," the courts have been disturbed by a situation where a word may be substituted for definite proof of an act. The various states have found different solutions: in some states, by statute, the testimony of the prosecutrix must be corroborated; in some jurisdictions no corroboration is necessary. See 44 Am.Jur., Rape, § 106. In still other jurisdictions, which include this one, the uncorroborated testimony of the prosecutrix may be sufficient to sustain a conviction of rape if the proof is clear and convincing and the surrounding circumstances are such as to indicate the probable guilt of the accused or, at least, to corroborate indirectly her testimony. However, if the story of the prosecutrix is intrinsically improbable or her actions before and after the time of the alleged offense are such as indicate (when considered in the light of ordinary rules of behavior) that the related event did not happen—then the uncorroborated testimony is not sufficient.

First above in this opinion we have stated rather fully the facts presented by the evidence. We find no fact that corroborates the simple statement of prosecutrix that she was raped or had sexual intercourse with appellant. To the contrary, the remainder of

the evidence points to the conclusion that the act did not occur.

We believe that the verdict was flagrantly against the evidence adduced.

Judgment reversed.