# IMPORTANT NOTICE
# NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: MARCH 24, 2022
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0112-MR

CARL WAYNE WEDDLE          APPELLANT


         ON APPEAL FROM KNOX CIRCUIT COURT
V.          HONORABLE GREGORY A. LAY, JUDGE
         NO. 19-CR-00211


COMMONWEALTH OF KENTUCKY          APPELLEE


**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**


Carl Wayne Weddle (Weddle) was convicted of three counts of first-degree sodomy and two counts of first-degree sexual abuse. He now appeals his conviction and resulting thirty-year sentence as a matter of right.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

The victim in this case, Jane,[2] was born in September 2011. Weddle began dating the victim's mother (the Mother) in early 2017. Towards the end of 2017, the Mother, Jane, and Jane's younger brother and sister moved in with Weddle. Jane and her younger brother are not Weddle's biological children, but her younger sister is.

---

[1] Ky. Const. § 110.

[2] Jane is a pseudonym used to protect the child's privacy.

Crystal Patterson (Patterson), a social worker with the Department for Community Based Services (DCBS), testified that she first had contact with the family between September and October 2018. All three children were removed from the home in November 2018 for issues unrelated to this case; the Mother suffered from mental health and substance use issues. The Mother then worked through her case plan with DCBS, and the children were returned to the home. Patterson testified that she had monthly contact with the family, as there was an ongoing pattern of the children being removed from the home and then returned. The children were removed from the home by DCBS again in July 2019 due to the Mother's continued struggles. Jane and her younger brother were placed with a temporary foster mother, Glenda Hubbard (Hubbard), while Jane's younger sister was placed with her paternal grandmother.

Hubbard testified that Jane had been in her care for about three weeks when Jane disclosed the allegations that gave rise to the criminal charges in this case. Hubbard said that, on the day of the disclosure, she had washed Jane's hair and was going to leave the bathroom so Jane could finish her bath. Jane did not want Hubbard to leave the bathroom, and then Jane "told her things." Hubbard reported what Jane told her to Patterson. Hubbard testified that, prior to Jane's disclosure, Jane did not have any unsupervised contact with any of her family members and Hubbard did not observe anyone trying to coach her into making the accusations.

After Hubbard reported Jane's disclosure to Patterson, Patterson initiated an investigation. Her investigation included reporting the alleged sexual abuse to the Kentucky State Police, as well as having Jane referred to a Children's Advocacy Center. A forensic medical examination was performed on Jane by Dr. Eddie Perkins (Dr. Perkins), who worked for the Children's Advocacy Center. Dr. Perkins testified that Jane was eight years old when he performed the examination in September 2019. His findings were that Jane had an "interrupted hymen" or, in other words, her hymen was mostly gone, but what was left had "deep clefts at 3 o'clock and 9 o'clock positions." He could not say with certainty what caused the damage to Jane's hymen, but it would have been caused by some kind of penetration with "a reasonable amount of force." He was also unable to say when the damage occurred; it could have happened a few months or years prior to the date of the examination. Finally, he testified that in his twenty-year career he had performed approximately 5,000-6,000 forensic examinations, and that injuries like Jane's are "pretty rare." He estimated that "somewhere around 2-5% of exams will show some kind of physical finding."

As we will discuss in more detail below, Jane, who was nine years old at the time of the trial, testified to several instances of sexual abuse perpetrated upon her by Weddle when she was six years old. She also said that Weddle showed her "inappropriate" videos of "people having sex" on his cell phone, and that no one but Weddle had ever touched her inappropriately.

3

Weddle testified in his own defense that he had never touched Jane inappropriately, nor had she ever touched him. He also denied ever showing her pornography. Weddle said that he did not know why Jane would make these allegations. Weddle's sister, Amy Weddle (Amy), also testified on his behalf. Amy said that she lived with the family for almost a year in 2018, and that she never saw Weddle sexually abuse any of the children. She said that Weddle took care of all of the children, and treated Jane and her little brother like they were his own children. Amy suggested that Jane made these allegations because she was angry at Weddle for not taking the children into his custody when they were removed from the home by DCBS. Finally, Weddle's defense counsel highlighted during its closing argument that he cooperated with both DCBS and the police regarding their respective investigations, and that he has always maintained his innocence.

Additional facts are discussed below as necessary.

## II. ANALYSIS

Weddle presents four arguments on appeal to support his contention that his conviction and sentence should be reversed: (1) that the trial court erred by denying his motion for directed verdict; (2) that the trial court erred by allowing Dr. Perkins to testify that Jane's hymen was not intact; (3) that the trial court erred by admitting evidence of Weddle's prior bad acts; and (4) that cumulative error occurred.

4

## A. The trial court did not err by failing to grant Weddle's motion for directed verdict.

Weddle's first argument is that the trial court erred by failing to grant his motion for directed verdict on three counts of first-degree sodomy and two counts of first-degree sexual abuse. At the outset, we note that this issue was not properly preserved for our review. At the close of the Commonwealth's evidence, Weddle's counsel made the following motion:

> I would move for directed verdict at this time on all the counts and any lesser included offenses. I think even drawing all fair and reasonable inferences in favor of the Commonwealth, the lack of DNA, the lack of any eyewitnesses, your honor, essentially, it's just the young girl's word against Mr. Weddle's. At this point I would say directed verdict should be given on all counts in favor of the defendant.

At the close of the defense's case, Weddle's counsel renewed the motion, stating:

> I would renew my motion for a directed verdict of acquittal at this time your honor on all the counts. Even drawing all fair and reasonable inferences in favor of the Commonwealth I don't believe it should be submitted to the jury on all the counts but especially the rape charge. I still don't believe that there was any evidence of penetration on that count in particular.

As discussed in section II(B) of this Opinion, the trial court granted the defense's motion as to the rape charge, but denied it with regard to the remaining charges.

As this Court has previously held numerous times, a motion for directed verdict "must state specific grounds for relief and should identify which elements of the alleged offense the Commonwealth has failed to prove. Merely moving summarily for a directed verdict or making a general assertion of

5

insufficient evidence is not enough."[3]  Accordingly, Weddle's argument is

unpreserved.  Nevertheless, "the burden is on the government in a criminal

case to prove every element of the charged offense beyond a reasonable doubt

and . . . the failure to do so is an error of Constitutional magnitude."[4]  And,

"alleged constitutional errors, if unpreserved, are subject to palpable error

review."[5]  Accordingly, we will review the issue for palpable error.  When this

Court engages in palpable error review, our focus is on whether "the defect is

so manifest, fundamental and unambiguous that it threatens the integrity of

the judicial process."[6]  Further,

> [o]n motion for directed verdict, the trial court must draw all fair
> and reasonable inferences from the evidence in favor of the
> Commonwealth.  If the evidence is sufficient to induce a reasonable
> juror to believe beyond a reasonable doubt that the defendant is
> guilty, a directed verdict should not be given.  For the purpose of
> ruling on the motion, the trial court must assume that the
> evidence for the Commonwealth is true, but reserving to the jury
> questions as to the credibility and weight to be given to such
> testimony.  On appellate review, the test of a directed verdict is, if
> under the evidence as a whole, it would be clearly unreasonable for

---

[3] *Baker v. Commonwealth*, 545 S.W.3d 267, 277 (Ky. 2018) (quoting *Commonwealth v. Jones*, 283 S.W.3d 665, 669 (Ky. 2009)).  *See also Ray v. Commonwealth*, 611 S.W.3d 250, 266 (Ky. 2020) ("[A motion for directed verdict must] identify the particular charge the Commonwealth failed to prove, and must identify the particular elements of that charge the Commonwealth failed to prove."); Kentucky Rule of Civil Procedure (CR) 50.01 ("A motion for a directed verdict shall state the specific grounds therefor.").

[4] *Miller v. Commonwealth*, 283 S.W.3d 690, 695 (Ky. 2009).

[5] *Walker v. Commonwealth*, 349 S.W.3d 307, 313 (Ky. 2011).  *See also Murphy v. Commonwealth*, 509 S.W.3d 34, 42 (Ky. 2017) ("The failure to identify a particular ground in a motion for directed verdict forecloses appellate review of the trial court's denial of the motion except to the extent that palpable error is shown.").

[6] *Stacy v. Commonwealth*, 396 S.W.3d 787, 791 (Ky. 2013).

a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.[7]

To support his argument, Weddle contends that, as a whole, Jane's uncorroborated testimony was so contradictory that this Court must reverse under *Carrier v. Commonwealth*.[8] In particular, he alleges that she testified in a "recant-allege-recant" pattern and had to be coaxed into responding by the Commonwealth's use of leading questions. Consequently, he argues, this case fits squarely under *Carrier*. The Commonwealth, in turn, has expressed uncertainty as to "whether this Court uses a modified standard with respect to child witnesses," and, at any rate, requests that we hold that *Carrier* has been overruled by implication. We will first address the relevant case law, and then analyze whether the evidence was sufficient to overcome Weddle's motion for directed verdict.

Generally, Kentucky does not require that the testimony of an alleged victim of a sex crime be corroborated in order to convict the alleged perpetrator. Stated differently, "the uncorroborated testimony of the prosecutrix may be sufficient to sustain a conviction of [a sex crime] if the proof is clear and convincing and the surrounding circumstances are such as to indicate the probable guilt of the accused or, at least, to corroborate indirectly her

---

[7] *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

[8] 356 S.W.2d 752 (Ky. 1962).

testimony."[9]  However, as we held in *Carrier,* this general rule is subject to one exception: "if the story of the prosecutrix is intrinsically improbable or her actions before and after the time of the alleged offense are such as indicate (when considered in the light of ordinary rules of behavior) that the related event did not happen—then the uncorroborated testimony is not sufficient."[10]

This rule was first articulated eight years prior to *Carrier* in the 1954 case *Holland v. Commonwealth,* which held that a "verdict of guilt of rape will be deemed unsupported by the proof where the evidence as to the necessary element of force or threatened violence to overcome resistance is so incredible or improbable or so at variance with natural laws or common human experience as to be patently untrue."[11]  The *Holland* Court reasoned that "[c]ases of this kind are so easily charged and difficult to disprove and often create such indignation on the part of jurors and courts, great care is required in their trial and review."[12]  The Court believed its newly articulated rule would alleviate this persistent problem in sex crime cases because it would help ensure that a conviction would not be "the result of passion and prejudice," but instead would be "based upon evidence having the quality of legal proof."[13]

---

[9] *Id.* at 754.

[10] *Id.*

[11] 272 S.W.2d 458, 459 (Ky. 1954).

[12] *Id.*

[13] *Id.*

The rule that the "unsupported testimony of [a] prosecutrix, if not contradictory or incredible, or inherently improbable, may be sufficient to sustain a conviction"[14] has remained part of our jurisprudence since the time of *Holland* and *Carrier*,[15] and was applied as recently as 2016 in *Bartley v. Commonwealth*.[16] In *Bartley*, the Defendant, citing the *Carrier* rule, argued on appeal that "the trial court should have granted his motions for directed verdict because [the victim's] testimony was 'uncorroborated and inherently improbable.'"[17] This Court acknowledged that there were some inconsistencies in the victim's testimony, but held that those inconsistencies "[were] not so severe as to render the remainder of her testimony inherently improbable."[18]

With that said, we decline the Commonwealth's invitation to overrule *Carrier* and its progeny. The reasoning behind the *Carrier* rule's existence remains sound: the evidence in a sex crime case often comes down to the victim's uncorroborated word against the defendant's uncorroborated claims of innocence. And, as previously discussed, the *Carrier* rule endeavors to provide

---

[14] *Robinson v. Commonwealth*, 459 S.W.2d 147, 150 (Ky. 1970).

[15] *See, e.g., Garrett v. Commonwealth*, 48 S.W.3d 6, 10 (Ky. 2001); *Commonwealth v. Cox*, 837 S.W.2d 898, 900 (Ky. 1992); *Dyer v. Commonwealth*, 816 S.W.2d 647, 651 (Ky. 1991), *overruled on other grounds by Baker v. Commonwealth*, 973 S.W.2d 54 (Ky. 1998); *Bussey v. Commonwealth*, 797 S.W.2d 483, 484 (Ky. 1990); *Robinson*, 459 S.W.2d at 150; *Carmicle v. Commonwealth*, 452 S.W.2d 378, 380 (Ky. 1970); *Clements v. Commonwealth*, 424 S.W.2d 825, 826 (Ky. 1968); *Kearney v. Commonwealth*, 386 S.W.2d 953, 954 (Ky. 1965); *Hurt v. Commonwealth*, 379 S.W.2d 726, 729 (Ky. 1964).

[16] 485 S.W.3d 335 (Ky. 2016).

[17] *Id.* at 346.

[18] *Id.* at 347.

9

a safeguard to ensure that a defendant is not convicted solely upon uncorroborated testimony that is "contradictory or incredible, or inherently improbable."[19] In addition, and to clarify, this rule does not apply solely to *child* sex crime victims. While it is true that the vast majority of the cases in this area of the law involved victims who were minors,[20] at least two cases, *Kearney v. Commonwealth*[21] and *Bussey v. Commonwealth*,[22] applied the *Carrier* rule to an adult victim's testimony. And, given the overarching purpose behind the rule, this Court can see no justification for limiting its application solely to the testimony of children.

This brings us to the evidence in this case. Weddle contends that Jane's uncorroborated testimony "contradicted every substantive allegation that she made on the stand, sometimes repeatedly." He further alleges that every damning response she gave was only in response to a leading question by the Commonwealth, though it should be noted that the defense never objected to any of the Commonwealth's questions. What follows is a recitation of the testimony that supported each of the convictions.

---

[19] *Robinson*, 459 S.W.2d at 150.

[20] *See, e.g., Cox*, 837 S.W.2d at 898 (victim was "less than sixteen years of age"); *Dyer*, 816 S.W.2d at 648 (victim was ten years old); *Carmicle*, 452 S.W.2d at 379 (victim was seventeen years old); *Clements*, 424 S.W.2d at 826 (victim was sixteen years old); *Hurt*, 379 S.W.2d at 727 (victim was "a child under the age of fifteen"); *Carrier*, 356 S.W.2d at 752 (victim was fourteen years old); *Holland*, 272 S.W.2d at 459 (victim was seventeen years old).

[21] 386 S.W.2d at 953.

[22] 797 S.W.2d at 484.

### 1. Count 2:[23] First-Degree Sodomy

For this count of first-degree sodomy, the jury instructions provided that the jury could find Weddle guilty if it found beyond a reasonable doubt that "he engaged in deviate sexual intercourse with [Jane] on one occasion by having her touch his penis with her mouth in the living room[.]"

The Commonwealth began its direct examination of Jane by asking her some background questions about herself. The Commonwealth then asked her if Weddle had ever done anything to make her feel bad or uncomfortable, to which she responded no. However, immediately thereafter the Commonwealth asked if Weddle ever had her touch him somewhere on his body. Jane responded that he had her touch his "private part." The Commonwealth asked her to stand up and point to where Weddle's "private parts" were; she pointed to her vagina. Jane further said that Weddle's clothes were off when this occurred. The following exchange then occurred between the Commonwealth and Jane:

> **Q:** And what did you touch him with?
> **A:** My hand.
> **Q:** Did you touch him with any other part of your body?
> **A:** (shakes head no)
> **Q:** How about your mouth?
> **A:** (nods head yes)
> **Q:** So your mouth touched his private part?
> **A:** (nods head yes)
> **Q:** Tell me about that if you could a little bit.
> **A:** I don't really remember that.

---

[23] The numbered "counts" referred to in this heading and the proceeding headings correspond to the counts as they were listed in the jury instructions. However, Jane testified to these counts out of order. For the sake of clarity, we will address the counts in the order in which she testified to them.

**Q:** You don't want to remember that, do you?
**A:** Nuh-uh (negative).
**Q:** You don't like talking about that?
**A:** Nuh-uh (negative).
**Q:** Would you rather not talk about it?
**A:** Mhm (affirmative).
**Q:** You know you do have to talk about it a little bit today, don't you?
**A:** Mhm (affirmative).
**Q:** We told you that, didn't we?
**A:** Mhm (affirmative).
**Q:** So, did your mouth touch his private part?
**A:** (nods head yes)

Jane first said that nothing came out of his private part when this happened, but she then said that "this stuff" came out of his private part into her mouth. She initially said the "stuff" did not taste like anything. But when the Commonwealth asked if it tasted good, she said no, and she said yes when the Commonwealth asked if it tasted bad. Jane said she spit the stuff out onto the floor, and that this incident occurred on the couch in the living room.

### 2. Count 4: First-Degree Sodomy

The jury instructions for this count of first-degree sodomy provided that the jury could find Weddle guilty if it believed beyond a reasonable doubt that Weddle "engaged in deviate sexual intercourse with [Jane] by having her touch his penis with her mouth in the bedroom[.]" The following testimony was elicited in support of this count:

**Q:** And did that ever happen, where he touched his private parts with your mouth on another time?
**A:** Mhm (affirmative), (shakes head no) not really.
**Q:** Well did it happen ever in the bedroom of the house?
**A:** (nods head yes)
**Q:** And did the same thing happen with the stuff coming out?
**A:** (shakes head no)

12

**Q:** No?  But did you touch his private parts with your mouth?
**A:** (nods head yes)

### 3. **Count 5: First-Degree Sodomy**

For the final count of first-degree sodomy, the jury was instructed that it could find Weddle guilty if it found beyond a reasonable doubt that Weddle "engaged in deviate sexual intercourse with [Jane] by touching her vagina with his mouth in the bedroom[.]"

The Commonwealth began its questioning on this issue by asking Jane if Weddle had ever touched her privates with any part of his body.  At that point Jane became visibly upset and covered her face with her hand, blocking her view of Weddle.  The questioning then continued:

**Q:** Can you just look at me then?  Is that okay?
**A:** (nods head yes)
**Q:** You don't have to hide your face then, just look at me okay?  He did touch you with a part of his body on your private place?
**A:** (nods head yes)
**Q:** Did he touch you with his privates?
**A:** No, his mouth.
**Q:** Did he touch you on your privates with his mouth?
**A:** Mhm (affirmative).
**Q:** What part of his mouth?
**A:** The inside of it.
**Q:** What part of the inside of it?
**A:** Just the whole mouth.
**Q:** Well, how about his tongue, did he touch you with his tongue?
**A:** (nods head yes)
**Q:** And where did that happen?
**A:** The living room or bedroom.
**Q:** Did that happen more than one time?
**A:** (shakes head no)

13

## 4. Count 1: First-Degree Sexual Abuse

For the first count of first-degree sexual abuse, the jury was instructed that it could find Weddle guilty if it believed beyond a reasonable doubt that he "subjected [Jane] to sexual contact on one occasion by rubbing his penis up and down on her vagina[.]" The testimony supporting that count was as follows:

> **Q:** [Jane], do you remember talking about how he put his private parts on your private parts?
> **A:** Mhm (affirmative)
> **Q:** And that happened?
> **A:** Mhm (affirmative)
> **Q:** And tell us what happened.
> **A:** That's all he did, that's what he only did.
> **Q:** Well, what did he do with his private parts?
> **A:** Just went up and down.
> **Q:** Went up and down?
> **A:** (nods head yes)
> **Q:** On your private parts?
> **A:** (nods head yes)
> **Q:** And how did it feel?
> **A:** Bad.

## 5. Count 3: First-Degree Sexual Abuse

For the final count, the jury was instructed that it could find Weddle guilty of first-degree sexual abuse if it believed beyond a reasonable doubt that Weddle "subjected [Jane] to sexual contact on one occasion in the shower by touching her vagina with his hand[.]" Jane testified as follows:

> **Q:** And, did [Weddle] ever take a shower with you?
> **A:** (nods head yes)
> **Q:** Were you in the shower together?
> **A:** (nods head yes)
> **Q:** How were you dressed?
> **A:** Naked.
> **Q:** How was he dressed?
> **A:** Naked.

14

**Q:** And when he was in the shower with you, did you touch him or did he touch you?
**A:** I touched him and he touched me.
**Q:** Was he washing your hair or did he touch you in a different place than on your head?
**A:** Not on my head, in a different place.
**Q:** Where was he touching you?
**A:** My private part.
**Q:** What did he touch you with?
**A:** His hand.

Immediately after this testimony, Jane said that Weddle also showed her "inappropriate" videos of "people having sex" on his phone, though there were no charges associated with that behavior. Jane said that she did not tell her mother about this abuse, but she did not know why.

On cross-examination, defense counsel elicited the fact that after Jane disclosed the sexual abuse, she spoke with several people about it, including someone at the Children's Advocacy Center and Patterson. However, the defense did not bring up any inconsistencies between her previous statements and her testimony at trial. In addition, defense counsel discussed several other men that Jane had lived with in the past, seemingly in an attempt to imply that someone else could have sexually abused her. Jane said that no one but Weddle had ever touched her inappropriately. Finally, Weddle's appellate brief states that Jane admitted that she rehearsed her testimony with the Commonwealth's Attorney. This is completely unsupported by the record. Defense counsel asked Jane if she spoke with the Commonwealth's Attorney before the trial, and if he told her what to say; Jane said yes. But, on redirect,

15

the Commonwealth asked Jane what it told her to say, and she responded, "the truth."

While we must agree that there were some inconsistencies in Jane's testimony, we are unwilling to hold that the inconsistencies were so severe that they rendered the rest of her testimony inherently improbable. The circumstances surrounding the abuse were not incredible or improbable: Weddle had ample access to Jane because he lived in the same home, and Jane testified that her mother was asleep in another room when the abuse occurred. And, as the Commonwealth argued in its closing argument, the inconsistencies in her testimony could very well have been due to the fact that Jane was a nine-year-old child reliving horribly traumatic events that occurred when she was six; events that she clearly did not want to discuss, let alone discuss in a room full of strangers. Accordingly, "[t]here was nothing so contradictory, incredible or inherently improbable about [Jane's] testimony as to require corroboration."[24] Any contradictions in her testimony were therefore a matter of credibility that remained within the peculiar province of the jury to decide.[25] And, based on the evidence as a whole, it was not clearly unreasonable for the jury to find Weddle guilty.

Based on the foregoing, we hold that the trial court did not palpably err by denying Weddle's motion for a directed verdict.

---

[24] *Garrett*, 48 S.W.3d at 10.

[25] *Id.*

16

## B. The trial court did not err by permitting Dr. Perkins to testify that Jane's hymen was not intact.

Weddle next contends that the trial court committed reversible error by allowing Dr. Perkins to testify that Jane's hymen was not intact.  He alleges that any probative value the testimony had was substantially outweighed by its prejudicial effect, thereby violating the balancing test of Kentucky Rule of Evidence (KRE) 403.[26]  The relevant sequence of events is crucial to addressing this issue.

Weddle's indictment included a charge of first-degree rape.  Consequently, going into the trial, it was assumed that the rape charge would ultimately be submitted to the jury.  Prior to trial, defense counsel filed a motion *in limine* to exclude Dr. Perkins' anticipated testimony.  The motion stated:

> Most significantly, Dr. Perkins may testify to the fact that the child does not have an intact hymen.  Such should be excluded per KRE 403 due to the fact that any probative value this testimony may present would be far outweighed by the unfairly prejudicial nature of the same.  Wherefore, Dr. Perkins cannot add anything so far as testimony is concerned and should be excluded from testifying herein.

The trial court later had a hearing addressing the motion.  Defense counsel renewed its argument that Dr. Perkins' testimony should be precluded under KRE 403.  The Commonwealth responded that Dr. Perkins conducted a

---

[26] KRE 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice").

forensic examination on Jane, and that he should be permitted to testify to his findings. The trial court ruled:

> Of course, assuming the doctor is properly qualified as an expert and that the questions asked by the Commonwealth are properly supported questions that lay sufficient foundation, the doctor can testify to his findings. I do think you're correct that the doctor can't make an opinion that the defendant did it, there's no way to do that, and there are some specific rules that I'm sure the Commonwealth is aware of about what, if any, history the doctor can relate to the jury as far as what the child told him. But the doctor can testify to his findings, so that part of your motion is overruled.

At trial, Dr. Perkins testified before Jane. As previously discussed, his testimony was that Jane's hymen was not intact, but he could not say who or what caused the damage or when it occurred. Jane's subsequent testimony did not allege that Weddle had ever penetrated her. The defense later moved for a directed verdict at the close of the Commonwealth's evidence. The trial court *sua sponte* raised concerns about the rape charge, as it did not believe she testified to penetration. The trial court said it would listen to her testimony again, and encouraged the defense to renew its motion at the close of its evidence. The defense later renewed its motion. The trial court found that there was no testimony from Jane that would allow it to submit the rape charge to the jury, but it would replace that count with a first-degree sexual abuse count based on her testimony that he "went up and down" on her vagina with his penis. The defense did not request a mistrial, nor did it request an admonition to the jury to disregard Dr. Perkins' testimony.

18

Weddle argues before this Court that Dr. Perkins' testimony had no probative value because none of the charges that were ultimately submitted to the jury required proof of penetration. But, he contends, the prejudicial effect of the testimony was tremendous because the jury would "go from Point A to Point B" and assume that Weddle had caused the disruption to Jane's hymen.[27] Weddle's pre-trial motion *in limine* preserved this issue for our review.[28] This Court reviews a trial court's ruling on a motion under KRE 403 for abuse of discretion.[29] "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[30]

While Weddle's point about the prejudicial nature of Dr. Perkins' testimony is well-taken, we cannot hold that the trial court erred. When the trial court made its ruling on the defense's motion *in limine*, it was anticipating that a rape charge, which requires proof of penetration,[31] would later be submitted to the jury. At that time, the court could not have known or anticipated that Jane would not testify to penetration. Therefore, when the court made the ruling, Dr. Perkins' testimony was to have a high probative

---

[27] We note that the Commonwealth has argued in response that the trial court erred by granting the defense's motion for directed verdict because Jane did not need to directly testify to penetration to support the charge. However, the Commonwealth did not file a cross-appeal on this issue, and we will consequently not address it.

[28] Kentucky Rule of Criminal Procedure (RCr) 9.22.

[29] *Webb v. Commonwealth,* 387 S.W.3d 319, 326 (Ky. 2012).

[30] *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999).

[31] *See* Kentucky Revised Statute (KRS) 510.040.

19

value: that a child so young did not have an intact hymen strongly suggested that she may have been raped at some point in the past. However, Dr. Perkins could not, and did not, testify that Weddle had caused the damage or that a penis had caused the damage. While Dr. Perkins' testimony certainly had some prejudicial effect, it was not substantially outweighed by its probative value. We consequently cannot hold that the trial court's ruling, under the information it had at that time, was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.

Rather, after the trial court granted the defense's motion for a directed verdict on the rape charge, the onus was on defense counsel to either move for a mistrial or request an admonition that the jury disregard Dr. Perkins' testimony to remedy the prejudicial nature of the testimony. It did neither, and it has not argued on appeal that the trial court should have *sua sponte* declared a mistrial or that it should have given an admonition *sua sponte*. We see no grounds for reversal.

### C. Weddle failed to properly preserve his arguments regarding the alleged admission of evidence in violation of KRE 404(b).

Weddle's third assertion is that the trial court erred by allowing the admission of four pieces of prior bad act evidence in violation of KRE 404(b). Specifically: (1) that Weddle and the Mother were living together out of wedlock; (2) that Patterson had been directed by her supervisors to offer services to the family prior to Jane's disclosure, and that Patterson had to keep monthly contact with the family; (3) that there had been "numerous domestic violence incidents" within the family; and (4) that Weddle had substance use issues.

20

Preliminarily, we hold that the testimony regarding Weddle and the Mother living together out of wedlock, and the testimony that Patterson had monthly contact with the family was not prior bad act evidence. KRE 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible . . . If offered for some other purpose[.]" Patterson testified to the following during the Commonwealth's direct examination:

> **Q:** Who lived in the home with [Jane]?
> **A:** Her mother, her mother's boyfriend [Weddle], and her two siblings[.]
> **Q:** I guess they're all [the Mother's] children, but [Jane] and [her younger brother], are they [Weddle's] children?
> **A:** No.
> **Q:** [Jane's younger sister], is she the daughter of the Defendant?
> **A:** Yes.
> **Q:** And I've been calling them a family, but they lived together in the home as a family?
> **A:** Yes.
> **Q:** Do you know if [the Mother] and the Defendant were married?
> **A:** They were not.
> **Q:** Can you recall when you started, the first time you may have had contact with the family in your official capacity?
> **A:** Yes. It was between September and October of 2018.
> **Q:** I don't want you to get into any details of things that happened. But, had you been assigned by your superiors to contact the family and offer services?
> **A:** Yes.
> **Q:** And between that date in 2018 until August of 2019, did you keep contact with the family?
> **A:** Yes, monthly contact.

Defense counsel did not object to this evidence. And, clearly, the Commonwealth was not attempting to paint Weddle in a bad light by eliciting this testimony. Rather, it was trying to establish background information for

21

the family itself, and trying to establish the context for Patterson's involvement with the family. In addition, we are unwilling to hold that, as a matter of law, living together out of wedlock or being part of a family requiring assistance from DCBS is a "bad act." We therefore hold that this testimony was not prior bad act evidence.

Pertaining to the testimony that that there had been "numerous domestic violence incidents" in the family, and that Weddle had substance use issues, Weddle filed two written pre-trial motions *in limine*. The first was a generic motion to prohibit the "admission of evidence of uncharged misconduct, 'bad acts,' prior convictions or charges, and other crimes related to the crimes charged in this Indictment." The motion did not identify any specific pieces of evidence that it sought to exclude. At the hearing on the motion, the defense made a specific objection to the DCBS records, which presumably would have contained the history of domestic violence incidents, but the objection was on hearsay grounds and not KRE 404(b) grounds:

> I filed another motion *in limine*, specifically about testimony of non-witnesses, your honor, and it might be tied a little bit to my previous motion . . . As to social services, your honor, particularly DCBS records, I believe that's been tendered, a lot of that that's in the record is going to be, basically, reports received by third parties that of course we can't confront. Quite a bit of DCBS records that I see are all reports, things like that, specifically Mr. Weddle along with the complainant's mother. So I would ask that that not be, I don't know if we can redact it, but I ask that the jury not see that or that not be alluded to; the fact that it's hearsay and I have no way to confront those people that called these things in.

The Commonwealth responded that it had no intention of entering the DCBS records into evidence, but it would inform the court if it felt the need to introduce any of it. The court ruled:

> I think generally your motion is well-taken and I will sustain it, but like [the Commonwealth] says, if he has a particular record that he feels is relevant to the examination of any particular witness you can bring that to the court's attention and if there's any objection we can show you the record and we'll deal with it then.

The defense's second written motion *in limine* was specific to his substance use disorder. It stated:

> Comes now the Defendant, by counsel, and respectfully moves, *in limine*, for an Order excluding improper character evidence of alleged drug abuse ... This motion is pursuant to KRE 402, 406, and 404, as the Defendant submits that any proffered evidence would constitute improper character evidence and will create a danger of undue prejudice to the Defendant.

However, no ruling on this motion exists in the record before us.

At trial, during the defense's cross-examination of Patterson, it elicited the following testimony:

> **Q:** As far as [the Mother]. Have you ever had cases with her in the past?
> **A:** Just from whenever I got the case load in September of '18.
> **Q:** But that was a previous case for DCBS with [the Mother]?
> **A:** As far as, that was whenever I received the case.
> **Q:** The case concerning these allegations?
> **A:** No.
> **Q:** There were different allegations?
> **A:** Yeah, it was an ongoing case.

The Commonwealth objected and argued that the defense had filed a motion *in limine* to keep the family's DCBS history out of evidence, but it was now asking

questions that would open the door to that evidence. In the Commonwealth's view, the defense's questions made it seem as though the Mother was the sole reason for DCBS's involvement with the family, but she was not. The Commonwealth argued that, if the defense was going to get into that evidence, the Commonwealth should be allowed to introduce Weddle's "extensive" history with DCBS. Defense counsel decided to withdraw the question notwithstanding the trial court's offer to dismiss the jury and have a hearing to address the issue. On redirect, the following exchange occurred between the Commonwealth and Patterson:

> **Q:** Between the time you came on the case and the time the children were ultimately removed, were all the allegations against [the Mother] or were there some problems with the Defendant?
>
> **A:** When I initially came on to the case, they were in regards to [the Mother], but along the line there were numerous domestic violence incidents and there were also substance abuse issues with [Weddle].

The defense did not object to the Commonwealth's question.

The Commonwealth contends that Weddle's arguments regarding the domestic violence history and his substance use are unpreserved, though for different reasons. First, pertaining to the domestic violence evidence, the Commonwealth argues that (1) the defense's written motion *in limine* was insufficient because, under *Lanham v. Commonwealth*,[32] a motion *in limine* must identify the specific piece of evidence to be excluded; and (2) the defense's

---

[32] 171 S.W.3d 14 (Ky. 2005).

oral motion to exclude the DCBS records was on hearsay grounds, not KRE 404(b).  We agree.

In *Lanham*, this Court held that a "blanket" motion *in limine* is not sufficient to preserve an error for appellate review:

> An objection made prior to trial will not be treated in the appellate court as raising any question for review which is not strictly within the scope of the objection as made, **both as to the matter objected to and as to the grounds of the objection**.  It must appear that the question was fairly brought to the attention of the trial court[.][33]

Accordingly, Weddle's written motion *in limine* was insufficient to preserve his argument regarding the domestic violence testimony because, though the motion sought to exclude any prior bad act evidence, it did not specifically "identify the evidence objected to."[34]  Likewise, his oral motion to exclude the DCBS records was insufficient because he argued that the records should not be admitted on hearsay grounds whereas he now argues before this Court that the evidence should have been precluded under KRE 404(b).

The Commonwealth next argues that Weddle's written motion *in limine* concerning the admission of his substance use disorder was insufficient to preserve his arguments because Weddle's counsel failed to obtain a ruling from the trial court on the motion.  Again, we agree.  KRE 103(d) directs that "[a] motion in limine **resolved by order of record** is sufficient to preserve error for

---

[33] *Id*. at 21 (quoting *Tucker v. Commonwealth*, 916 S.W.2d 181, 182 (Ky. 1996), *overruled on other grounds by Lanham v. Commonwealth*, 171 S.W.3d 14 (Ky. 2005)) (emphasis added).

[34] *Lanham*, 171 S.W.3d at 22.

appellate review."[35]  And, as noted in *Lanham*, "[w]here a party specifies what evidence should be suppressed and why, the question has been 'fairly brought to the attention of the trial court' **and the trial court's ruling preserves the issue for appeal**."[36]  Here, defense counsel failed to obtain a ruling from the trial court on its motion concerning his substance use.  We therefore cannot say that this issue is preserved for our review.

Weddle did not request that this Court review either of these issues for palpable error.  "[A]bsent extreme circumstances amounting to a substantial miscarriage of justice, an appellate court will not engage in palpable error review under RCr 10.26 unless such a request is made and briefed by the appellant."[37]  Neither the history of domestic violence nor Weddle's substance use was ever mentioned again during the trial.  Indeed, it seems the Commonwealth's intention behind asking the question that received the objected-to response was to establish that the Mother was not the sole reason for DCBS's involvement with the family.  Accordingly, there were no extreme circumstances amounting to a substantial miscarriage of justice, and we decline to review for palpable error.

**D. No cumulative error occurred.**

Finally, Weddle argues that if this Court holds that the trial court erred by admitting Dr. Perkins' testimony and the prior bad acts evidence, but that

---

[35] (Emphasis added).

[36] *Id*. at 21. (emphasis added).

[37] *Webster v. Commonwealth*, 438 S.W.3d 321, 327 (Ky. 2014).

26

the errors were individually harmless, we should reverse under the cumulative error doctrine. Under the cumulative error doctrine, "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair."[38] But, as no error occurred in the admission of either Dr. Perkins' testimony or the prior bad act evidence, we hold that no cumulative error occurred.

## III. CONCLUSION

Based on the foregoing, we affirm.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Travis Alan Rossman
Rossman Law, PLLC

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Christopher Henry
Assistant Attorney General

---

[38] *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010).